## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL RANDOLPH, derivatively on behalf of CARBONITE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MOHAMAD S. ALI, ANTHONY FOLGER, STEVE MUNFORD, LINDA CONNLY, SCOTT DANIELS, DAVID FRIEND, CHARLES KANE, TODD KRASNOW, and MARINA LEVINSON, <br><br> Defendants, <br><br> -and- <br><br> CARBONITE, INC., <br><br> Nominal Defendant. | Case No.: 1:19-cv-12212 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE ACTION:** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## <u>SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Michael Randolph ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Carbonite, Inc. ("Carbonite", or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Mohamad S. Ali, Anthony Folger, Steve Munford, Linda Connly, Scott Daniels, David Friend, Charles Kane, Todd Krasnow, and Marina Levinson (collectively, the "Individual Defendants" and together with the Company, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Carbonite, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Carbonite, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Company's directors and officers from February 7, 2019 through to present (the "Relevant Period").

2.     Defendant Carbonite, headquartered in Boston, Massachusetts, is a software company that provides cloud-based backup services. On October 18, 2018, Carbonite launched its "Server Backup VM Edition" for managed services providers ("MSPs"). The new service was designed to allow MSPs to protect their virtual data locally and in their own cloud.  Carbonite said this was "the culmination of one of our largest cross-functional efforts, led by our exceptional engineering organization…". The Server Backup VM Edition was forecast to add "meaningfully" to Carbonite's profits for fiscal 2019. Instead, from the beginning of its launch, the Server Backup VM Edition was of poor quality and technologically flawed and received poor customer reviews and complaints, or as Carbonite put it: "the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite" and Carbonite was required to remove "any growth expectations associated with virtual server edition from our short-term outlook."  Just as damaging, was the poor reception of the Server Backup.

3.      During the Relevant Period, the Individual Defendants breached myriad fiduciary duties by causing and or allowing the Company to issue materially false and/or misleading statements, as well as by failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company not to disclose to investors: that: (i) Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result of the foregoing, Carbonite lacked any reasonable for issuing its positive projections and financial forecasts.

4.      On July 25, 2019, Carbonite announced that it was withdrawing its Server Backup VM Edition product from the marketplace and consequently dramatically lowered its financial projections for fiscal 2019 and 2020. That same day, the strongest supporter of Server Backup VM Edition, Defendant Ali (defined below), announced he was leaving Carbonite. On this news, Carbonite stock declined more than 24%, from $23.90 per share when the market closed on July 25, 2019, to $18.01 per share when the market closed on July 26, 2019, on extremely heavy trading volume.

5.      The Individual Defendants' breaches of fiduciary duty and other misconduct exposed the Company to a federal securities fraud class action lawsuit pending in the United States

6.      District Court for the District of Massachusetts (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to

the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, costing the Company millions of dollars.

7.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

8.     A majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that the Individual Defendants (defined below), most of whom are the Company's current directors, are liabile for the alleged fraud, breaches of fiduciary duty and misconduct alleged herein. Thus, the Individual Defendants are interested in the outcome of the suit and demand upon the Board would be futile. .

## JURISDICTION AND VENUE

9.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. §1367.

10.    This Court has jurisdiction over each Defendant named herein because each is an entity that conducts business in and or maintains operations in this District or individual with sufficient contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District in accordance with 28 U.S.C. §1391 because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary

participation in the wrongful acts detailed herein as well as aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff has continuously held Carbonite common stock during the Relevant Period.

**Nominal Defendant**

13.     Defendant Carbonite, Inc. is a software company that provides cloud-based backup services. Carbonite's shares trade under the ticker "CARB" on the NASDAQ, an efficient market. Carbonite is a Delaware corporation with its principal place of business in Boston, Massachusetts.

**Individual Defendants**

14.     Defendant Mohamad S. Ali ("Ali") was the Chief Executive Officer ("CEO") of Carbonite during the Relevant Period.  Between February 14, 2019 and June 17, 2019, Ali sold 51,907 shares of Company stock for proceeds in excess of $1.1 million.

15.     Defendant Anthony Folger ("Folger") is, and at all relevant times was, during the Relevant Period, Chief Financial Officer ("CFO") and Treasurer of Carbonite.  Between February 11, 2019 and July 1, 2019, Folger sold 53,763 shares of Company stock for gross proceeds in excess of $1.26 million.

16.     Defendant Steve Munford ("Munford") has served as a Company Director since January 2014, and as Chairman of the Board since March 2016.

17.     Defendant Linda Connly ("Connly") has served as a Company Director since February 2019. She serves as a member of the Compensation Committee.

18.     Defendant Scott Daniels ("Daniels") has served as a Company Director since January 2016. He serves as a member of the Audit Committee and Chair of the Information Security Risk Committee.

19.     Defendant David Friend ("Friend") has served as a Company Director since February 2005.

20.     Defendant Charles Kane ("Kane") has served as a Company Director since July 2011. Kane is chair of the Audit Committee and a member of the Nominating and Governance Committees.

21.     Defendant Todd Krasnow ("Krasnow") has served as a Company Director since September 2005. Kransnow serves as a member of the Audit Committee and Chair of the Compensation Committee.

22.     Defendant Marina Levinson ("Levinson") has served as a Company Director since May 2017. Levinson serves as Chair of the Nominating and Governance Committee and as a member of the Information Security Risk Committee.

23.     Defendants Munford, Connly, Daniels, Friend, Kane, Krasnow and Levinson above are collectively referred to herein as the "Director Defendants."

24.     The Director Defendants, Ali and Folger are collectively referred to as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.    On October 18, 2018, Carbonite launched the Server Backup VM Edition for MSPs. MSPs are entities that remotely manage a customer's IT infrastructure and/or end-user systems. A virtual machine ("VM") is a software program or operating system capable of performing tasks such as running applications and programs as if it were a separate computer. Carbonite's Server Backup VM edition was designed to allow MSPs to protect virtualized environments both locally and in their own cloud. In introducing the Server Backup VM Edition, Carbonite hoped to compete against companies such as Veeam, which pioneered the market for VM data protection.

26.    In conjunction with the launching of the Server Backup VM Edition, Carbonite also introduced its "refreshed" and expanded Data Protection Console which would be a "purpose-built backup for virtual machines (VMs) and enable[] businesses to select, manage and recover their VM data from a single location, the Carbonite Data Protection Console." The combination of the Server Backup VM Edition with the "refreshed" Data Protection Console would permit Carbonite to offer to its customers "a fully integrated service that protects virtualized environments both locally and in their own cloud."

27.    During a conference call on November 1, 2018, Ali made it clear that the launch of Carbonite Server VM Edition would be a very important driver in the growth of Carbonite's financial performance for 2019 and 2020.

### The Individual Defendants Caused the Company to Issue False and Misleading Statements

28.    On February 7, 2019, Carbonite issued a press release announcing its full year 2018 financial results and provided financial projections and guidance for fiscal 2019. Ali commented on the results stating, in pertinent part:

We delivered on our strategic priorities in 2018. We significantly strengthened our product platform and introduced one of the most complete Software-as-a- Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability. In 2019 we plan to build upon these efforts, further expanding our data protection platform and delivering a broader set of solutions to our customers, while we invest aggressively in our distribution channels with a focus on driving continued growth and profitability.

* * *

**Business Outlook**

Based on the information available as of February 7, 2019, Carbonite expects the following for the first quarter and full year of 2019:

First Quarter 2019:
       Current Guidance
       (2/7/2019)

| | |
|---|---|
| GAAP Revenue | $76.5 - $77.5 million |
| Non-GAAP Revenue | $77.0 - $78.0 million |
| Adjusted EBITDA | $20.0 - $21.5 million |

Full Year 2019:
       Current Guidance
       (2/7/2019)

| | |
|---|---|
| GAAP Revenue | $468 - $482 million |
| Non-GAAP Revenue | $488 - $502 million |
| Non-GAAP Gross Margin | 80.5% - 81.5% |
| Adjusted EBITDA | $129 - $134 million |

Carbonite's expectations of adjusted EBITDA for the first quarter and full year of 2019 excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense and acquisition-related expense from net income (loss). The 'Business Outlook' above assumes nine months of contribution from Webroot.

29.     On May 2, 2019, Carbonite continued falsely projecting positive financial results for fiscal 2019 when it released its first quarter 2019 financial results on Form 8-K for the period ended March 31, 2019, signed by Danielle Sheer, General Counsel of the Company, reporting increased projections for fiscal 2019 for non-GAAP revenue to a range of $491 million to $505

million, an increase from its prior guidance of $488 million to $502 million. On that date,

Carbonite issued a press release in which Ali stated, in pertinent part:

> We had a good first quarter and a strong start to 2019, with first quarter revenue and adjusted EBITDA above the high-end of our guidance. We are excited to have closed the Webroot acquisition as planned and started the integration process. Together, these leading solutions will provide robust protection of data, devices and networks for our partners and customers.

30.     On the same day, Carbonite held a conference call with analysts and investors to

discuss the Company's earnings and operations. During his prepared remarks, Ali represented

that the Company delivered better-than-expected revenue driven by strong performance of

Carbonite data protection solutions stating in pertinent part:

> We've delivered better-than-expected revenues in the first quarter, driven by strong performance of our Carbonite data protection solutions as well as the benefit of having closed the Webroot transaction a few days before the end of the quarter. In addition to delivering better-than-expected revenue, we also exceeded our adjusted EBITDA guidance and reported strong earnings per share and free cash flow.
>
> * * *
>
> During the first quarter, we successfully closed several larger customer transactions and we continue to see large deal momentum in the pipeline, primarily on the data protection side of the business. The ease-of-use and the power of our solutions combined with our award-winning customer service creates an opportunity to serve these larger customers, while we continue to focus on our core end market, which is small and midsized business.
>
> * * *
>
> We have the right product portfolio to serve the broader set of businesses like these 2 great organizations, and we have the incredible product, ease of use that businesses have come to know and expect. Our focus continues to be on bringing all of our products together under the unified data protection platform to continue to deliver great value to the market, and we'll be sure to update everyone as we make progress throughout 2019.

31.     For his part, Folger provided the Company outlook, stating in pertinent part:

> Now turning to our outlook. As I think about the growth profile of our data protection business, I continue to expect low single-digit revenue growth in 2019 with growth in subscription revenue, partially offset by a decline in our non- subscription revenue. Consistent with our prior outlook, I expect our endpoint security business to continue growing in the low double digits. Combined that should produce mid-single-digit revenue growth in the near term with the opportunity to accelerate, driven by additional

focus on investment in our indirect channels, successful cross-selling and realizing revenue synergies from our combination with Webroot. For the second quarter, we expect GAAP revenue to be in the range of $119 million to $123 million. This includes the impact of purchase accounting adjustments on deferred revenue. Non-GAAP revenue in the range of $133 million to $137 million with the large sequential increase driven by a full quarter of Webroot contribution, and adjusted EBITDA in the range of $34 million to $36 million.

32.     Further, during the question and answer session, Ali talked about the excitement

from their products and their channel, stating in pertinent part:

**Matthew George Hedberg** - *RBC Capital Markets, LLC, Research Division - Analyst*

It's really good to hear the success on large deals on the data protection side. I would imagine some of that's due to the unified data protection platform. But I guess can you put a finer point on sort of the success there and maybe sort of how you think about the pipeline of these larger deals? And because I imagine some of the sales cycles can be little bit longer there. But just a little bit more color on sort of how you're thinking about that side of your business.

**Mohamad S. Ali** - *Carbonite, Inc. - President, CEO & Director*

Yes, I'll tell you a little bit, and then Anthony can add to it.  So actually, these larger deals are Carbonite endpoint deals typically. As Anthony mentioned, last year we launched a new endpoint product. And this endpoint product gives us scalability beyond anything that we had before.  The product that we had previously really was a fit for a company up to 25 employees. Beyond that, there were scalability issues and mostly deployment and manageability issues. It wasn't built for large-scale centralized management mostly.

This new product that we have out there, I mean has these excellent features up and down, right, and sort of has everything that you need. And this product, it does core backup, it does ransomware protection. It does legal hold. If you lose the device, you can locate it on a map. If you lose the device, you can remotely wipe it. So it's really a full-feature product, and it can scale to a business of up to 2 million customers. So it's extremely, extremely scalable. It's globally deployable. So if you're a business with operations in 50 countries, it can be deployed.

And so what we've seen is that some of these newer partners that we've brought on board like Dell and some of the other ones that have access to a customer set that ranges from the SME to the enterprise, they are bringing to us these -- some of these larger deals.  And they're exciting, and we're using the same product to fulfill those deals. But you're right. I mean those do have longer sales cycles, and we put a small team in place to work those longer sales cycle deals. But at the end of the day, though, the product set that we have, our focus is really on the SME market. And I think with this particular product, it does scale up and down, and we do have a

channel that can sell it. So it's exciting in that regard. Does that answer the question?

33.     For his part, Folger said that they were seeing "good returns from [] channel partners," and that the pipeline was building "quite nicely" around these partners, as reflected in the following exchange:

**Matthew George Hedberg** - *RBC Capital Markets, LLC, Research Division - Analyst*

Yes, it does. Yes. And then maybe as a somewhat related question, you mentioned channel partners a couple of times in your answer. Given Webroot's focus more on the MSP side and you guys have a channel focus, you highlighted additional partner investments you guys are making. I think you've even highlighted Veritas. How do you kind of think about, from a spending perspective, the balance between leveraging MSP, sort of a business that you're still trying to probably get your arms around, but also sort of investing in channel? I mean is there sort of like a trade- off of trying to balance the 2?

**Anthony Folger** - *Carbonite, Inc. - CFO & Treasurer*

Yes, and great question. So at the high level, you can think about Webroot as having a channel of 14,000 MSPs and Carbonite having a channel of 10,000 VARs or resellers, and some of them happen to be very big like a Dell or a CDW or a Veritas, and some of them are very small. So we continue, on the data protection side, the Carbonite side to invest in those channel partners because we're seeing good returns from those channel partners, especially now that we have the new portfolio of products, and in 2019 we will be unifying them under the console. So now that we have the portfolio, we're putting the dollars to enable the partners.

One of the things -- in Q4, I think one of the things that happened in Q4 was that we had a lot of new products but we probably didn't spend enough to enable the partners. And now, we are investing behind those partners so they are enabled. And we are seeing the pipeline build quite nicely around those partners. But those are not MSP partners, right? That's sort of the -- I'd call them all VARs of some sort or the other.

Once we have -- now those VARs are actually interested in selling Webroot. And so the enablement that we're doing behind those partners on the data protection product will be extensible to enabling them to sell Webroot security products, right? And Webroot has multiple security products. It has the endpoint security, but it also has security awareness training, has DNS, they have Wi-Fi. So they have 4 products there that could -- at the right time, could go into the VAR portfolio. And then on the flip side, as we enable Carbonite endpoint and Carbonite Server, integrate that with the RMM dashboard, the MSPs will start being able to the sell that in 2020.

So the investments that we're making on the channel partners on the data protection side is important for the new products that we brought to market but will also pay dividends once we enable them on the Webroot products.

34.     The statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result of the foregoing, Carbonite lacked any reasonable for issuing its positive projections and financial forecasts.

**The Individual Defendants Issued a Materially False and Misleading Proxy Statement**

35.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement, which sought stockholder votes for director re-election.

36.     On April 5, 2019, the Director Defendants caused the Company to file its 2019 Proxy Statement ("The 2019 Proxy Statement") with the SEC pursuant to Section 14(a) of the Exchange Act seeking their respective elections as directors for one-year terms. The 2019 Proxy Statement was signed by Danielle Sheer, General Counsel of the Company.The 2019 Proxy Statement, however, contained material misstatements and omissions.[1]

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about these allegations and related claims.

37.     The 2019 Proxy Statement contained the following statement concerning the Company's Code of Business Conduct and Ethics ("the Code of Conduct")[2]:

> We have adopted a Code of Business Conduct and Ethics (the "Code") that is applicable to all of our directors, officers and employees. The Code includes standards and procedures for reporting and addressing potential conflicts of interest, the accuracy of the Company's financial records, corporate opportunities and insider information, as well as a general code of conduct that provides guidelines regarding how to conduct business in an ethical manner. A copy of the Code is available on our website on the investor relations page at http://investor.carbonite.com/corporate-governance. Any waivers of the Code for directors or executive officers, or any amendments to the Code, shall be posted on the Company's website within four business days of such amendments or waivers, as the case may be and, to the extent required by the listing standards of NASDAQ, by filing a Current Report on Form 8-K with the SEC, disclosing such information.

38.     The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public, and failed to comply with laws and regulations, or conduct business in an honest and ethical manner.

## **THE TRUTH EMERGES**

39.     On July 25, 2019, Carbonite issued a press release announcing its second quarter 2019 financial results for the period ended June 30, 2019. In this release, Carbonite announced the resignation of Defendant Ali and dramatically reduced its financial guidance for fiscal 2019 for (i) GAAP revenue to a range of $$443.5 million to $448.5 million, a decrease from its prior guidance of $457 million to $471 million; and (ii) non-GAAP revenue to a range of $477.5 million to $482.5 million, a decrease from its prior guidance of $491 million to $505 million.

40.     On the same day, Carbonite held a conference call with analysts and investors. In his opening remarks, Folger offered an explanation for the dramatically reduced financial guidance for fiscal 2019, stating in pertinent part:

---

[2] Carbonite Code of Conduct: https://investor.carbonite.com/static-files/974ab8a4-70cf-4dad-b2f0-ab3e359f9831

So what happened? Well, in the second quarter, we experienced challenges in our data protection business related to products and go-to-market effectiveness. ***Towards the end of the quarter, we determined that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite***.

Many of you will remember that this was newly launched in Q3 of 2018 and something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020. ***While we assessed the best path forward, we have removed any growth expectations associated with virtual server edition from our short-term outlook***. Our go-to-market efforts were also challenged in the second quarter.

Compared to Q1, we converted pipeline at a lower rate and also closed fewer large deals. While we saw encouraging results from our channel, it was not enough to offset these challenges. With new leadership in place, we are already taking steps to improve our performance. However, our Q2 trends form a new baseline that we are flowing through our model, resulting in our lower guidance for the year. (Emphasis added).

41.     Just as importantly, as explained by Carbonite's interim CEO and President, Munford, the poor quality and technological failures of the Server Backup VM Edition were acting as a "disruptive" factor throughout the Carbonite salesforce and preventing that sales organization from closing opportunistically on several larger deals during fiscal 2019. Munford stated, in pertinent part:

Firstly, as you mentioned, the problems that our virtual server launched and us pulling down from the market, I mean, ***we launched the product in the market that is growing and there's a lot of demand. But we just didn't have the quality we needed. And we need to step up. And that is disruptive and it's, yes, at least part, if not all, the reason for the lower guide. But it's part of that and is disruptive to the sales organization.  So that is not less about being in a good market.  It's more about not executing on your product strategy***. (Emphasis added.)

42.     In response to the above revelations, the price of Carbonite stock declined more than 24%, from a close on July 25, 2019 of $23.90 per share, to a close on July 26, 2019 of $18.01 per share, on extremely heavy trading volume.

43.     The market for Carbonite stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Carbonite stock traded at artificially inflated prices during the Relevant Period.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers and/or directors of Carbonite and because of their ability to control the business and corporate affairs of Carbonite, the Individual Defendants owed Carbonite and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Carbonite in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Carbonite and its shareholders so as to benefit all shareholders equally.

45.     Each director and officer of the Company owes to Carbonite and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Carbonite, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers, directors, and controllers of Carbonite were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of

the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Carbonite, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Carbonite's Board at all relevant times.

49.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

50.     To discharge their duties, the officers and directors of Carbonite were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Carbonite were required to, among other things:

a.  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States, and pursuant to Carbonite's own Code of Ethics and Conduct;

b.  remain informed as to how Carbonite conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

c.  establish and maintain systematic and accurate records and reports of the business and internal affairs of Carbonite and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Carbonite's operations would comply with all applicable laws and Carbonite's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

e.  exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

f.  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

g.  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

accurate disclosure of all material facts concerning, inter alia, each of the subjects

and duties set forth above.

51.     Each of the Individual Defendants further owed to Carbonite and its shareholders

the duty of loyalty requiring that each favor Carbonite's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position,

influence or knowledge of the affairs of the Company to gain personal advantage.

52.     At all times relevant hereto, the Individual Defendants were the agents of each other

and of Carbonite and were always acting within the course and scope of such agency.

53.     Because of their advisory, executive, managerial, directorial, and controlling

positions with Carbonite, each of the Individual Defendants had access to adverse, non- public

information about the Company.

54.     The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein,

as well as the contents of the various public statements issued by Carbonite.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55.     In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further

aided and abetted and assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of

corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Carbonite was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Carbonite and was at all times acting within the course and scope of such agency.

## CARBONITE'S CODE OF CONDUCT AND AUDIT CHARTER

60.     The Director Defendants, as officers and/or directors of Carbonite were bound by the Company's Code of Conduct[3] ("the Code") which states, in part, as follows:

> This code intends to ensure fair and accurate financial reporting, to promote ethical conduct in compliance with applicable laws, rules and regulations, to provide guidance with respect to the handling of ethical quandaries, to encourage a culture of openness and accountability and to deter wrongdoing.

61.     It further states "the Company shall adhere to the highest standards of honesty and integrity in the conduct of its business. To the extent that this Code sets forth a more stringent standard of conduct than is required by applicable laws or commercial practice, the Company and all of its Employees and directors shall adhere to these more stringent standards". The Code further prescribes that, "the Company's books, records, accounts and financial statements shall be maintained in reasonable detail and reflect the matters to which they relate accurately, fairly and completely. All books, records, accounts and financial statements shall also conform to applicable law and to the Company's system of internal controls. The Company's assets must be carefully and properly accounted for, no undisclosed or unrecorded account or fund shall be established for any purpose, and no false or misleading entries shall be made in the Company's books or records for any reason."

62.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a).

---

[3] See Carbonite Code of Conduct:
 https://investor.carbonite.com/static-files/974ab8a4-70cf-4dad-b2f0-ab3e359f9831

## CARBONITE'S AUDIT & COMPLIANCE COMMITTEE CHARTER

63.     In addition, Board members who served on the Audit Committee owed specific

duties to Carbonite under the Company's Audit & Compliance Committee Charter[4] ("Audit

Charter") which provides that the Committee shall "assist the Board with the oversight of the

Company's corporate accounting and financial reporting processes, the audits of its financial

statements and its internal control processes. The Committee shall serve as an independent and

objective body to monitor the Company's financial reporting processes and system of internal

controls. As necessary and appropriate, the Committee shall also provide the Board with

recommendations regarding improvements to be made to the Company's financial reporting

system and system of internal controls."

64.     Specifically addressing financial reporting standards, the Audit Charter provides

that the Committee must examine all changes and potential changes in accounting practices and

ensure that financial information is reported properly:

> The Committee shall prepare an annual committee report for inclusion, where necessary, in the proxy statement of the Company relating to its annual meeting of securities holders and in such other reports as the Committee shall deem necessary or advisable pursuant to applicable SEC rules; The Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Committee and the Chief Financial Officer of the Company any matters identified in connection with the independent auditor's review of interim financial information which are required to be discussed by applicable accounting standards. The Committee shall direct the Company's management to advise the Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of such information; The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earning guidance provided to analysts, rating agencies and other third-parties. The Committee shall approve all press releases containing financial information regarding the Company prior to dissemination; The Committee shall coordinate the Board's oversight of, and ensuring compliance

---

[4] See Audit Charter at:
 https://investor.carbonite.com/static-files/b018071d-1145-46fd-91ed-9fddd52484c1

with, the Company's internal control over financial reporting and disclosure controls and procedures. The Committee shall receive and review the reports of the Chief Executive Officer and Chief Financial Officer of the Company required by Rule 13a-14 of the Exchange Act.

## DAMAGES TO CARBONITE

65.     As a direct and proximate result of the Individual Defendants' conduct, Carbonite has lost and will continue to lose and expend many millions of dollars. Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, and certain executives, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, including possible restatements.

66.     Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

## DERIVATIVE ALLEGATIONS

67.     Plaintiff brings this action derivatively and for the benefit of Carbonite to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Carbonite, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof. Carbonite is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

68.     Plaintiff is, and has been at all relevant times, a shareholder of Carbonite. Plaintiff will adequately and fairly represent the interests of Carbonite in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

69.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

70.    A pre-suit demand on the Board of Carbonite is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven directors, Munford, Connly, Daniels, Friend, Kane, Krasnow, and Levinson.  Plaintiff needs only to allege demand futility as to a majority of Directors that were on the Board at the time this action was commenced.

71.    Demand is excused as to all of the Directors because each one of them face, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

72.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

73.    Carbonite has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for Carbonite any part of the damages Carbonite suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

74.     The conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self- interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile. The acts complained of herein constitute violations of fiduciary duties owed by Carbonite's officers and directors, and these acts are incapable of ratification. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Carbonite. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Carbonite, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.

Thus, demand on the Directors is futile and, therefore, excused. If there is no directors' and officers' liability insurance, then the Directors will not cause Carbonite to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well. Thus, for all the reasons set forth above, all of the Directors, and, if not all of them, at least a majority of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## Audit Committee

75.     Demand is otherwise futile with respect to the three members of the Audit Committee (Daniels, Kane and Krasnow) because they face the risk of substantial liability stemming from their failure to oversee the Company's compliance with applicable accounting regulations despite their mandate to do so under the Audit Committee Charter.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

76.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

77.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

78.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

79.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

80.     Under the direction and watch of the Directors, the Proxy Statement failed to disclose material informational and omitted material information was there was a duty to do so. For example, the Proxy Statement also failed to disclose, *inter alia*, that: (i) Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result of the foregoing, Carbonite lacked any reasonable for issuing its positive projections and financial forecasts.

81.     The false and misleading elements of the 2019 Proxy Statement led to the re-election of the Directors, which allowed the Individual Defendants to continue breaching their fiduciary duties to Carbonite. Plaintiff, on behalf of Carbonite, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

82.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

83.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Carbonite's business and affairs.

84.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

85.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Carbonite.

86.     In breach of their fiduciary duties owed to Carbonite, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (i) Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing

opportunistically on several larger deals during fiscal 2019; and (iv) as a result of the foregoing, Carbonite lacked any reasonable for issuing its positive projections and financial forecasts.

87.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

88.     The Audit Committee members had a duty to review the Company's press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Carbonite's public statements and internal control function.

89.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Carbonite's securities.

90.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Carbonite's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

91.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Carbonite has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

93.     Plaintiff on behalf of Carbonite has no adequate remedy at law.

## **THIRD CLAIM**

### **Against Individual Defendants for Unjust Enrichment**

94.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

95.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Carbonite.

96.     The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses, stock options, or similar compensation from Carbonite that was tied to the performance or artificially inflated valuation of Carbonite or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

97.     Plaintiff on behalf of Carbonite has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

98.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.     The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

100.    As a result of the failures of internal control and resulting financial misstatements, the Individual Defendants have caused the Company to incur costs associated with the investigation into such misstatements and the restatement of two quarterly reports and one annual report.

101.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Carbonite to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its services.

102.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

103.    Plaintiff on behalf of Carbonite has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of Carbonite, and that Plaintiff is an adequate representative of the Company;

B.  Declaring that the Individual Defendants have breached Section 14(a) of the Exchange Act;

C.  Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Carbonite;

D.  Declaring that the Individual Defendants were unjustly enriched;

E.  Determining and awarding to Carbonite the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

F.  Directing Carbonite and the Individual Defendants to hold an annual meeting of the stockholders;

G.  Directing Carbonite and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Carbonite and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

a.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board; and

b.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

c.  Awarding Carbonite restitution from Individual Defendants, and each of them;

d.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

e.  Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated:   October 25, 2019

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By:  /s/ *Shannon L. Hopkins*
Shannon L. Hopkins (BBO No. 657485)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
shopkins@zlk.com

Gregory Mark Nespole
**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
gnespole@zlk.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 25th day of October, 2019, I caused a true and correct copy of the foregoing *Shareholder Derivative Complaint* to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Shannon L. Hopkins*
Shannon L. Hopkins
